IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN WILLIAM SCHARNHORST, III                                          PLAINTIFF

v.                        Civil No. 5:22-CV-05138-TLB-CDC

CHIEF DEPUTY JAY CANTRALL, Washington County Detention Center;
MAJOR RANDALL DENZER, Washington County Detention Center;
LIEUTENANT KEVIN EAST, Washington County Detention Center;
LIEUTENANT NOLAN AKE, Washington County Detention Center;
LIEUTENANT AMANDA ARNOLD, Washington County Detention Center    DEFENDANTS

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff John William Scharnhorst, III, a prisoner,[1] filed this civil rights action pursuant

to 42 U.S.C. § 1983, generally alleging that he was denied access to literature, religious materials,

and the daily newspaper while incarcerated at the Washington County Detention Center (WCDC)

in violation of the First Amendment.[2]  (ECF No. 1).  Plaintiff proceeds *pro se* and *in forma*

*pauperis* (IFP).  (ECF No. 3).  Pursuant to the provisions of 28 U.S.C. § § 636(b)(1) and (3), the

Honorable  Timothy  L.  Brooks,  United  States  District  Judge,  referred  this  matter  to  the

---

[1] Plaintiff was a pretrial detainee at the Washington County Detention Center (WCDC) at all times
relevant to the claims in the Complaint.  (ECF No. 1).  Publicly accessible records show that he
is currently in the custody of the Arkansas Division of Correction (ADC), incarcerated at the
Barbara Ester Unit, 7500 Corrections Circle, Pine Bluff, AR 71603.  *See* Inmate Search, The
Arkansas  Division  of  Correction,  https://apps.ark.org/inmate_info/search.php  (last  visited
October 27, 2023).

[2] This is one of seven civil rights actions Plaintiff has filed in this District stemming from his
pretrial incarceration at the WCDC. *See Scharnhorst v. Helder*, Case No. 5:22-cv-05167-TLB-
CDC (W.D. Ark. Aug. 10, 2022); *Scharnhorst v. Cantrell*, Case No. 5:22-cv-05176-TLB-CDC
(W.D. Ark. Aug. 30, 2022); *Scharnhorst v. Cantrell*, Case No. 5:22-cv-05218-TLB-CDC (W.D.
Ark. Oct. 19, 2022); *Scharnhorst v. Cantrell*, Case No. 5:22-cv-05232-TLB-CDC (W.D. Ark.
Nov. 28, 2022); *Scharnhorst v. Cantrell*, Case No. 5:22-cv-05238-TLB-CDC (W.D. Dec. 14,
2022); *Scharnhorst v. Ake*, Case No. 5:22-cv-05243-TLB-CDC (W.D. Ark. Dec. 19, 2022).

undersigned for the purposes of making a Report and Recommendation on Defendants' Motion for Summary Judgment.  (ECF No. 89).  Plaintiff responded and filed a statement of facts and affidavit in support.  (ECF No. 101-102).  This matter is ripe for the Court's consideration, and, for the reasons outlined below, this Court recommends that Defendants' Motion for Summary Judgment be GRANTED, in part, and DENIED, in part.

## I.      BACKGROUND

The Court views Plaintiff's Complaint as consisting of three claims.  First, Plaintiff alleges that several times from December 2021 until the filing of the Complaint (July 15, 2022), Defendants Nolan Ake and Kevin East denied his requests and grievances about receiving literature, news, and religious materials.  (ECF No. 1).  Second, Plaintiff contends that despite his formal written requests, Defendants Randall Denzer, Jay Cantrell, and Kevin East have refused to modify the WCDC policy to allow for inmates' access to literature, news, and religious materials.  *Id.*  Third, according to Plaintiff, Defendants Ake and Amanda Arnold "have failed to consistently provide the local newspaper or to implement a procedure to ensure that the newspaper be provided on a consistent basis and organized fashion."  *Id.*  Plaintiff identifies Defendants in their individual and official capacities, and requests compensatory and punitive damages.  *Id.*  Plaintiff also asks that the WCDC policy be modified to allow for access to books, magazines, newspapers, and religious materials and that "a library and book cart be maintained in order to provide the detainees with a sufficient supply of reading and religious materials."  *Id.*  Defendants seek summary judgment and dismissal of all of Plaintiff's claims.  (ECF No. 89).

It is noted that Plaintiff's claim requesting consistent access to the daily newspaper is the subject of a preliminary injunction, providing, in full:

> The Washington County Detention Center is ORDERED to provide a daily newspaper to inmates in electronic format, and if an electronic version is unavailable, to provide another form of access, such as a hard copy.

(Opinion and Order at p. 5 (ECF No. 21)).   The undersigned previously recommended that Defendants be found in contempt for violating that injunction on November 27, 2022.  (ECF No. 87).  U.S. District Judge Brooks adopted that recommendation over the Defendants' objection and sanctioned the Defendants $100.00, payable to the Court. (Order (ECF No. 95)).  Because Plaintiff is no longer incarcerated at the WCDC, that preliminary injunction is now moot.  *See Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (claim for injunctive relief moot when prisoner transferred facilities and was therefore no longer subject to the conditions giving rise to the request for injunctive relief).

## II.     LEGAL STANDARD

In considering Defendants' Motion for Summary Judgment, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party."  *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is material only when its resolution would affect the outcome of a case.  *Anderson*, 477 U.S. at 248.

Further, the moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001).  In response, the nonmoving party "may not rest upon mere denials or allegations but must instead set forth specific facts sufficient

to raise a genuine issue for trial." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). In considering a summary judgment motion, the court views all the evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

### III.   FACTS

For the purposes of the pending Motion, the undersigned considers the following facts:[3]

At the Washington County Detention Center (WCDC), the "chief executive" establishes "written policy to provide recreation and leisure time activities, library services, social and religious services" for detainees. (Ex. A-10, Washington County Sheriff's Office, Detention Center S.O.P at p. 2 (ECF No. 91-7)). Further, "[i]n the past several years, WCDC has changed to systems to conduct substantially all the communication between detainees and staff (and even some contractors) electronically. This includes grievances, requests, sick calls, maintenance requests, communication with the food provider, communication with the technical services

---

[3] Plaintiff submitted an affidavit in support of his response in opposition to Defendants' Motion for Summary Judgment. (Scharnhorst Aff. (ECF No. 101)). In that affidavit, Plaintiff asks this Court to consider as true the facts he alleges in the Complaint in *Scharnhorst v. Cantrell*, Case No. 5:22-cv-05238-TLB-CDC (W.D. Dec. 14, 2022), the Amended Complaint in *Scharnhorst v. Cantrell*, Case No. 5:22-cv-05218-TLB-CDC (W.D. Ark. Oct. 19, 2022); and the Amended Complaint *Scharnhorst v. Cantrell*, Case No. 5:22-cv-05232-TLB-CDC (W.D. Ark. Nov. 28, 2022). *Id.* ¶ 7. Plaintiff does not identify which specific facts in those pleadings he wants this Court to consider, and this Court will not mine the record (or the record of cases not presently before the Court) looking for facts to support his arguments. *See, e.g.*, *Shuh v. Burleigh Motor Detention Center*, Case No. 1:20-CV-142, 2022 WL 2293421 at * 6 (D.N.D. Apr. 21, 2022) ("[I]t is not incumbent on the court to look through all the documents [plaintiff] has filed to date in an effort to divine what he [is] trying to assert or to cobble together claims for him), *report and recommendation adopted by* 2022 WL 2291885 (D.N.D. June 24, 2022). Accordingly, this Court considers Plaintiff's affidavit, which also incorporates by reference Plaintiff's Statement of Disputed Facts, and the verified complaint to determine whether there are any material fact disputes that would preclude granting summary judgment. *See Ward v. Moore*, 414 F.3d 968, 970 (8th Cir. 2005) (a verified complaint is the equivalent of an affidavit and can serve as a response to the defendants' motion for summary judgment under Fed. R. Civ. P. 56(e)).

4

provider, communication with the volunteer chaplains, commissary, and so on." (Ex. B, Ake Aff. ¶ 11 (ECF No. 91-9)). The Court first turns to the contours of this electronic kiosk/tablet system and then addresses the WCDC policies on inmates' access to books and literature, religious materials, and the daily newspaper.

### A. The Washington County Detention Center Kiosk/Tablet System

Tech Friends developed the Washington County Detention Center (WCDC) kiosk/tablet system. (Ex. C, McKinley Aff. ¶ 2 (ECF No. 91-10)). But Tech Friends generally partners with companies who, in turn, provide the Tech Friends hardware and software to the correctional institutions. *Id.* ¶ 2. At the WCDC, Summit Food Service provides the hardware and software developed by Tech Friends. *Id.* ¶ 3. Tech Friends also did not develop all the features of the WCDC tablet/kiosk system; for example, a third-party makes the "law library" accessible on the kiosk/tablet system and WCDC personnel upload the daily newspaper as a PDF document onto the Tech Friends website, which inmates can then access from the kiosks/tablets. *Id.* ¶ 6. Further, while Summit Food Service maintains the hardware, Tech Friends "technicians are able to log into the system remotely to investigate and if necessary, repair technical issues in the kiosk and table [sic] system at the Washington County Detention Center." *Id.* ¶ 4.

Tech Friends offers detainees "free sessions" so that all detainees can access the tablet/kiosk system. *Id.* ¶ 7. The length and frequency of these "free sessions" depends on whether the detainee is using the tablet or the kiosk. An inmate can use the kiosk for 30-minutes every 15- minutes (known as the "cool down period"). *Id.* at ¶ 7. When the 15-minute "cool down period" ends, the inmate is allowed to access the kiosk again for another 30 minutes before triggering a second 15-minute "cool down period." *Id.* at ¶ 7. There is no limit on the number of

times an inmate can repeat this cycle each day.  *Id.* at ¶ 9.

 The same is not true for the tablets:  WCDC inmates can access the tablets "for free" for fifteen minutes every three hours for a maximum of one hour per day.  *Id.* ¶¶ 7, 9.  Even if the inmate only accesses the tablet for a portion of those 15-minutes and then logs out, he cannot log back into a tablet for three hours from the time he logged out.  *Id.* ¶ 10.  If an inmate is locked out of the tablets (either because he is in the middle of the 3-hour "cool down" period or because he has already reached his daily tablet time limit), he "should still be able to log into a kiosk."  *Id.* ¶ 7.  If an inmate (or an outside third-party on *behalf* of the inmate) purchases a "Gold Pass," he has access to the tablet/kiosk for one-hour without any "cool down" interruptions.  *Id.* ¶ 8.  The WCDC allows inmates to access the kiosks/tablets from 5:30 am – 8:30 pm.  *Id.* ¶ 11.

 The implementation of the WCDC "tablet/kiosk" system has helped to minimize the introduction and circulation of paper in the facility.  (Ex. B, Ake Aff. ¶ 12 (ECF No. 91-9)).  Historically, loose paper, particularly newspaper, in the WCDC "has been used to cover lights, windows, and cameras, obscuring the ability to surveil the [inmate] population effectively."  *Id.* ¶ 7.  "Loose paper has also been used in attempts to defeat locks (by pressing wads of wet paper into the locking mechanism when a door is open), impair ventilation (by covering or stuffing air vents), to flood cells (by forcing significant amounts of paper into the toilet and flushing the toilet repeatedly until the paper backs up the plumbing), to conceal contraband (by using paper to hide prohibited items between the paper so that it is not easily visible), and to make weapons (by folding newspaper several times and creating a type of hard club that can cause serious injury)."  *Id.* ¶ 8.

 According to Defendant Ake, the "use of the kiosk (and later, tablets) [has] helped to

reduce loose paper, it has helped track and identify issues that needed attention quicker and with more thorough review of the correct personnel.  Electronic communications in the kiosk system cannot be lost or changed after-the-fact and provide a readily available manner of review and follow up on issues, needs, or complaints in the facility." *Id.* ¶ 12.  At the WCDC, detainees "can now use email through the kiosks or tablets.  Each detainee is provided two emails per week at no cost." *Id.* ¶ 17.  Further, the WCDC "pays approximately $1,200 per year for the digital subscription" of the newspaper. *Id.* ¶ 21.  "It has been a part of the daily operations at the Washington County Detention Center for the last few years for staff (usually the shift Lieutenant) to upload the digital version of the newspaper early in the morning each day." *Id.* ¶ 23.  "More recently, the WCDC has added the law library to the kiosk." *Id.* ¶ 32.  Further, "[t]here is a collection of free books, including various religious materials, that are available on the tablets in the WCDC." *Id.* ¶ 44.

### B. Books and Literature

According to the Washington County Sheriff's Office, Detention Center, S.O.P.:

> [Inmate] [a]ccess to books, reading materials and legal materials is outlined and explained in the Washington County Detention Center Handbook, page #9, under the Heading 'Books' and 'Legal Materials.' This handbook is available to all detainees housed at the Washington County Detention Center.

(Ex. A-10, Washington County Sheriff's Office, Deten. Ctr. S.O.P. at 2 (ECF No. 91-7)).  The WCDC Handbook: Rules and Regulations for Detainees, in turn, provides, in full:

> Reading material is available from a book cart, which is brought to the cellblock during the week.  You may have paperback books brought in to you.  **All books brought into the detention center become the property of the Washington County Detention Center.** Pornography is prohibited. Hardcover books are prohibited. If you willfully destroy a book you will lose book cark privileges. You are allowed to have no more than three (3) paperback books, from the book cart, at a time.  All excess books will be confiscated and returned to the book cart.

(Ex. A-11, Washington County Detention Center Handbook at 2 (ECF No. 91-8)).[4]

According to Defendant Ake, the detainees are "allowed to keep up to 4 paperback books (including a religious manual if they choose) in their housing area." (Ex. B, Ake Aff. ¶ 35 (ECF No. 91-9)).  There is nothing in the record suggesting that inmates must pay a fee for access to the book cart or to keep books in their cells.  Notwithstanding the WCDC *written* policy on books, Defendant Ake explains that given concerns about books being used to introduce contraband into the facility, the WCDC has "limited [its] practice to only accepting donations of paperback books from local libraries or other similar entities and to requiring that all book donations are to the facility and cannot be directed to a particular detainee."  *Id.* ¶ 40.

Further, Defendant Ake explains that the COVID-19 pandemic affected the distribution of books in the facility:

> The book cart was one of the first items frequently moved between the housing areas on a daily basis.  Because of this, there were times from March 2020 until the present ([there was] recently a COVID outbreak in the WCDC), where the book cart remained in one block for an extended period of time or where it was not used for a period of time because of the inability to clean or sanitize the books and the efforts to maintain separation between units. Books in the possession of detainees during periods of COVID quarantine or isolation were not removed and were not returned to the book cart or passed to other housing areas.

> *Id.* ¶ 43 (internal footnote omitted).

But, according to Defendant Ake,

> [t]here is a collection of free books, including various religious materials, that are available on the tablets in the WCDC. [The WCDC is] currently attempting to add more books and reading materials to the tablet system. Thus far, [the WCDC has] not allowed detainees to order digital books because [the WCDC is] not able to

---

[4] The pages numbers at the bottom of the page are not always consistent with the CM/ECF pagination noted at the top of each page.  To establish some consistency, the Court references the CM/ECF pagination.

limit access to the books to a single detainee.

*Id.* ¶ 44.

Defendant Ake says that the "use of more digital books will avoid damage or destruction of books by detainees and allow more detainees access to books at the same time.  In addition, there will be added savings in personnel time and attention which was required to inspect donated paperback books." *Id.*

Plaintiff, by contrast, says that "[f]rom November 18, 2021, to January 17, 2023, it was nearly impossible to get the book cart."  (Scharnhorst Aff. ¶ 2 (ECF No. 101)).  Plaintiff says that "on the very few occasions that the book cart was provided the only books on the book cart were various copies of the Bible.  The book cart contained no literature whatsoever." *Id.*  According to Plaintiff, he was often "denied the book cart altogether [and] was told over and over that there was no book cart." *Id.*  Plaintiff also says that "[b]ooks were not available on the kiosk.  There was an extremely limited variety of books available on the tablets." *Id.*

## C. Religious Materials

The WCDC Detainee Handbook provides that "[r]equests to see Clergy must be made in the Religious Services section of the kiosk in [the inmate's] cellblock.  The Washington County Detention Center does have a Chaplain on staff. . . . Clergy must abide by all the rules governing regular visitation.  Clergy members are prohibited from paying bills, delivering mail, notes, books, papers, other materials or co-sign bonds. . . Do not make requests of the clergy, which violate facility policy."  (Ex. A-11, Washington Cnty. Dent. Ctr. Handbook, at 2 (ECF No. 91-8)) ("Detainee Handbook").

According to Defendant Ake, the "WCDC does not purchase religious books or materials."  (Ex. B, Ake Aff. ¶ 45 (ECF No. 91-9)).  Instead, "religious materials are available to

detainees in the WCDC through the volunteer chaplains at the WCDC." *Id.*  Defendant Ake says

that "[d]etainees may communicate with the chaplains via the kiosk or tablets, or sometimes in

person, and can ask for specific materials, religions, or subject matter.  If the chaplains are able

to obtain the information by donation or by locating free resources, they will then share the

requested materials with the detainee."[5] *Id.*

For his part, Plaintiff says that "from November 18, 2021, until late 2022 the jail staff

refused to deliver the religious materials provided by the chaplains." (Scharnhorst Aff. ¶ 3 (ECF

No. 101)).  Plaintiff contends that he made "countless requests to the chaplains for materials,

which they acknowledged and alerted the jail staff.  The jail staff did not deliver these materials

and refused to allow the chaplains to deliver them." *Id.*

### D.  Daily Newspaper

Only a portion of the WCDC Detainee Handbook is in the record, and that portion does

not include any information on inmate access to the daily newspaper.  *See* (Ex. A-11, Detainee

Handbook (ECF No. 91-8)).   Rather, Defendant Ake explains that "[w]hen the statewide

newspaper became regularly available on a digital basis, a digital subscription not only served the

ongoing effort to limit loose paper in the jail, it also made the newspaper available to more

detainees (at the same time) at a substantially reduced cost to the County."  (Ex. B, Ake Aff. ¶ 20

(ECF No. 91-9)).  According to Defendant Ake, "[i]t has been a part of the daily operations at the

Washington County Detention Center for the last few years for staff (usually the shift Lieutenant)

---

[5] The Detainee Handbook notes that the WCDC "does have a Chaplain" on staff. (Ex. A-11, Detainee Handbook, at 2 (ECF No. 91-8)). But Defendant Ake refers to the chaplains as "volunteers." (Ex. B, Ake Aff. ¶ 45 (ECF No. 91-9)).  It is unclear to the Court whether the Detainee Handbook contains a typo or if, in fact, the WCDC has volunteer (unpaid) chaplain(s) on staff.

to upload the digital version of the newspaper early in the morning each day." *Id.* ¶ 23. "While there are days that the upload may occur later in the day, there have been fewer delays in delivery of the newspaper to the detainees since switching to the digital version and access was not limited during COVID as it was in other facilities. If an upload is missed for any reason, staff makes every attempt to upload it as soon as possible." *Id.* In support of their Motion, Defendants attach a document entitled "Newspaper Index." (Ex. A-8, Newspaper Index (ECF No. 91-5)). This Index is alleged to illustrate that:

> Between November 18, 2021 . . . and July 15, 2022 . . . a newspaper was uploaded to the kiosk for inmates to read every day except for 8 days where a newspaper was not uploaded, 2 days where the newspaper was uploaded a day late, and 4 days where the newspaper was uploaded more than one day late.

(Statement of Indisputable Facts, ¶ 3 (ECF No. 91)).[6]

> On the other hand, according to Plaintiff,

> [b]etween November 18, 2021 and July 15, 2023, the newspaper was not uploaded on at least 9 days including 11/19/21, 12/24/21, 12/25/21, 02/06/22, 03/13/22, 03/26/22, 05/06/22, 05/15/22, 06/26/22; was uploaded more than one day late on at least 5 days including 01/03/22 uploaded 01/06/22, 04/09/22 uploaded on 04/13/22, 05/29/22 uploaded 06/01/22, 06/08/22 uploaded 06/16/22, 07/3/22 uploaded 07/06/22; was not 'available' due to being mislisted at least 9 days including 12/22/21, 12/23/21, 01/06/22, 01/08/22, 02/19/22, 02/24/22, 03/27/22, 07/13/22, 7/14/22; was not uploaded until after [he had] lodged a complaint and after [his] hour out, which was the only opportunity [he] had to read the newspaper on at least 2 days including 06/01/22, 07/01/22; and was uploaded a day late at least 2 days 05/31/22 uploaded 06/01/22, 06/03/22 uploaded on 06/04/22.

> (Statement of Disputed Facts ¶ 2 (ECF No. 102)).[7]

---

[6] Defendants start counting from November 18, 2021, the day the Plaintiff was booked into the WCDC. (Defendants' Statement of Indisputable Facts ¶ 3 (ECF No. 91)). The Court notes, however, that the relevant timeframe (as plead in the Complaint) is from December 2021 to July 15, 2022 (the date of the Complaint). (Comp. (ECF No. 1)).

[7] Although Plaintiff says that he is counting from November 18, 2021, to July 15, 2023, the Court understands the "2023" date to be a typo because none of the dates Plaintiff goes on to list is from 2023. Rather, all the dates cover the period alleged in the Complaint (November 18, 2021, to

In sum, Plaintiff counters that "[i]n less than 8 months, the newspaper was not available to [him] at least 27 times." *Id.*

The WCDC "pays approximately $1,200 per year for the digital subscription" of the newspaper. *Id.* ¶ 21. "This is a significant savings from a subscription for paper copies of the newspaper and allows county funds to be used in other ways in the detention center as a result." *Id.* Further, "[b]ecause the annual subscription is budgeted and appropriated by the Washington County Quorum Court based on the prior years' experience, there is no other money budgeted/appropriated for use on newspapers than the amount of the annual subscription." *Id.* ¶ 22. In reviewing this evidence, the undersigned is mindful of its prior consideration of the newspaper availability issues. *See* (Report & Recomm. (ECF No. 87)).

## IV.    ANALYSIS

Considering these facts, the Court first addresses the constitutionality of WCDC policies on inmates' access to books and literature, religious materials, and the daily newspaper. The undersigned then turns its consideration to whether there are any material facts which are in dispute that would preclude granting summary judgment on Plaintiff's individual and official capacity claims.

### A. WCDC Policies

The WCDC policies at issue – inmates' access to books and literature, religious materials, and the daily newspaper – implicate inmates' First Amendment rights. "The Supreme Court has made it clear that persons who are incarcerated do not forfeit First Amendment protection of their rights to freedom of speech and religion at the prison gate." *Human Rights Defense Ctr. v. Baxter*

---

July 15, 2022).

12

*Cnty. Ark.*, 999 F.3d 1160, 1164 (8th Cir. 2021) (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). Nevertheless, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* (quoting *Bell*, 441 U.S. at 547).

"To determine whether a jail or prison policy infringes on the First Amendment rights of inmates, as well as those seeking to communicate with them, 'the relevant inquiry is whether the policy is reasonably related to legitimate penological interests." *Id.* (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (internal quotations omitted)).   In answering this question, courts apply the so-called four factor *Turner* test:

> (1) Whether a "valid rational connection" exists "between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" to the policy.

*Turner v. Safley*, 482 U.S. 78, 90-91 (1987).   Thus, the Court must examine the WCDC policies at issue under *Turner.*

### 1.  Books and Literature

As noted above, the WCDC policy on inmates' access to books and literature, as outlined in the WCDC Detention Center Handbook, provides as follows:

> Reading material is available from a book cart, which is brought to the cellblock during the week. [Inmates] may have paperback books brought in to [them]. . . . [Inmates] are allowed to have no more than three (3) paperback books, from the book cart, at a time.

(Ex. A-11, Washington County Detention Center Handbook, at 2 (ECF No. 91-8)).

But Defendant Ake, Captain of the WCDC, concedes that the Handbook policy is not the *complete or accurate* policy on books and literature that the WCDC has been implementing.

13

According to Defendant Ake, the "WCDC has provided access to other reading material through use of a book cart system that is stocked with donated paperback books. Detainees are allowed to keep up to 4 paperback books (including a religious manual if they choose) in their housing area. Books that are destroyed or damaged (for instance, when pages are torn out or missing, or the binding is torn or separated) are taken from the book cart and discarded as trash." (Ex. B, Ake Aff. ¶ 35 (ECF No. 91-9)). Defendant Ake goes on to explain that while the WCDC had previously accepted paperback donations from friends or family of WCDC detainees, the WCDC has now "limited [its] practice to only accepting donations of paperback books from libraries or other similar entities and to requiring that all book donations are to the facility and cannot be directed to a particular detainee." *Id.* ¶¶ 37, 40.

Further, according to Defendant Ake, "there were times from March 2020 until the present . . . where the book cart remained in one block for an extended period of time or where it was not used for a period of time because of the inability to clean or sanitize the books and the efforts to maintain separation between units." *Id.* ¶ 43. Additionally, Defendant Ake maintains that "[t]here is a collection of free books, including various religious materials, that are available on the tablets in the WCDC." *Id.* ¶ 44.

The first *Turner* factor requires a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 90-91. Defendant Ake asserts that the WCDC instituted the practice of prohibiting family and friends from donating paperback books to inmates because the WCDC has "had more than one instance of finding detainees intoxicated or impaired in a housing area where [the WCDC] [was] able to identify the source of the drugs (after the fact) as a donated book where drugs were soaked into

14

the pages or tucked tightly against the inside binding of the book." *Id*. ¶ 38.  The WCDC has "also identified other prohibited items hidden in books brought in for detainees such as money, pictures, and prohibited correspondence."  *Id.*  The Court finds the WCDC practice of prohibiting family and friends from sending inmates paperback books has been rationally articulated as related to the WCDC's interest in reducing or eliminating "opportunities for introduction of contraband into the WCDC." *Id.* ¶ 51.

The second *Turner* factor asks whether alternative means are available for Plaintiff to assert his First Amendment right to access to literature.  While alternative means of asserting this right do not need to be "ideal," they do need to be "available." *See Human Rights Defense Ctr.*, 999 F.3d at 1165 (citing *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003)).  "If the alternative means are illusory, impractical, or otherwise unavailable, this would weigh in favor of [the plaintiff] under the second *Turner* factor." *Id.*

Here, Defendant Ake says the "WCDC [has] limited [its] practice to only accepting donations of paperback books from local libraries or other similar entities . . .." *Id.* ¶ 40.  Further, Defendant Ake says that "[t]here is a collection of free books, including various religious materials, that are available on the tablets in the WCDC." *Id.* ¶ 44.  There is, however, nothing in the record establishing how many books (or how often) libraries and other "similar entities" donate materials to the WCDC each year.

In terms of the WCDC "book cart," moreover, Plaintiff, by contrast, has asserted that "[f]rom November 18, 2021 to January 17, 2023, it was nearly impossible to get the book cart." (Scharnhorst Aff. ¶ 2 (ECF No. 101)); *see also* (Ex. A-2, Requests and Grievances at p. 22 (ECF No. 91-3)) (Scharnhorst reports on June 30, 2022, that he has been "asking for the book cart for

weeks").[8]  Plaintiff also says that "[t]ypically [he] was denied the book cart altogether. [He] was told over and over that there was no book cart." *Id.*

Defendant Ake appears to concede that the book cart was a "cart" in name only, explaining that as part of the WCDC's effort to reduce and limit the spread of COVID-19, "there were times from March 2020 until the present . . . where the book cart remained in one block for an extended period of time or where it was not used for a period of time because of the inability to clean or sanitize the books and the efforts to maintain separation between units."  (Ex. B, Ake Aff. ¶ 43 (ECF No. 91-9)).

Plaintiff also takes issue with the quantity and variety of books available on the book cart. According to Plaintiff, "[o]n the very few occasions that the book cart was provided the only books on the book cart were various copies of the Bible." (Scharnhorst Aff. ¶ 2 (ECF No. 101)). On July 7, 2022, Defendant Ake responded to Plaintiff's kiosk submission (wherein Plaintiff alleged the WCDC books and literature policy violated his constitutional rights) explaining, "[t]here are books on the kiosk and books on the book cart the newspaper is placed on the kiosk daily and there is a tv playing in you block during the day."  (Ex. A-2, Requests and Grievances at 28 (ECF No. 91-3)).   Indeed, Defendant Ake refers to the books available on the tablets as a "collection." (Ex. B, Ake Aff. ¶ 44 (ECF No. 91-9).  Plaintiff asserts, by contrast, that "[t]here was an extremely limited variety of books available on the tablets." (Scharnhorst Aff. ¶ 2 (ECF

---

[8] Exhibit A-2 is a portion of the grievances Plaintiff filed on the WCDC kiosk/tablet system when he was incarcerated at the WCDC.  The pagination on the bottom of the page is inconsistent with the CM/ECF pagination.  The Defendants refer to the pagination at the bottom of the page.  *See generally* (Defendants' Statement of Indisputable Facts (ECF No. 91)). To be consistent with all other references by this Court to the summary judgment record, this Court refers to the CM/ECF pagination at the top of the page.

No. 101)).

The record is also void of any listing of the titles and specific quantity of books available to inmates on the tablets during the timeframe plead in the Complaint.  As noted elsewhere, unless an inmate purchases a "Gold Pass," the inmate can access a tablet – assuming one is available and operable – for only fifteen minutes before the system logs him out for the next three hours. (Ex. C, McKinley Aff. ¶ 7 (ECF No. 91-10)).  According to Plaintiff, "[he] was on 23/1 lockdown for almost the entirety of [his] stay at WCDC. . . . This means that **IF** a tablet was available (which they were not) [he] would've had 15 minutes per day to read only the selected limited literature available on the tablets." (Scharnhorst Aff. ¶ 2 (ECF No. 101)).  A "Gold Pass" allows the inmate one uninterrupted one-hour session on the tablet.[9]  *Id.*  The record is also silent as to how many tablets are available in each cell block.  There is no dispute that there are no books available on the kiosk.  Furthermore, while there is nothing in the record explicitly saying whether inmates can purchase paperback books directly from the publisher, there is no dispute that inmates are not allowed to purchase digital books.  (Ex. B, Ake Aff. ¶ 44 (ECF No. 91-9)).

On this record before it, the Court finds there is a material fact dispute about whether the WCDC's alternative means of allowing inmates access to literature – namely, through the book cart and the tablets – are, in fact, "available" to the inmates, particularly considering where, as here, there is a material fact dispute both about the quantity of books inmates can access and the *opportunity* for that access.  The Court notes, for example, that allowing inmates to store up to 4

---

[9] There is nothing in the record about the cost of the "Gold Pass," whether there is a limit on the number of "Gold Passes" an inmate is authorized to purchase each day, or whether inmates can purchase a "Gold Pass" to extend an uninterrupted 1-hour session for multiple consecutive 1-hour sessions (in effect allowing certain inmates to "monopolize" tablets).

paperback books (including one religious text) from the book cart in their cells (purportedly at no cost to them) is in no way equivalent to limiting inmates (who do not pay for or cannot afford a "Gold Pass") to fifteen minutes on a tablet every three hours, particularly where the tablet must invariably be shared with an unknown number of other detainees. The Court further observes there is a material fact dispute about whether it is even *possible* for inmates to keep up to four paperback books in their cells considering that the "book cart" does not contain many books; the book cart may not contain any books other than the Bible; the cart itself is often stationary and thus unavailable to populations of inmates; and it is unclear whether inmates are permitted to purchase books (paperbacks or otherwise) directly from the publisher.

There are also factual disputes regarding the third and fourth *Turner* factors. These factors require the court to consider whether accommodating the Plaintiff's request (for meaningful access to books and literature) would have a "significant ripple effect on the guards, other inmates, and prison resources" and to "evaluate whether there is an alternative that fully accommodates the prisoner 'at de minimis cost to valid penological interests.'" *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004).

Defendant Ake explains here that the book cart was relatively stationary during the COVID-19 pandemic to minimize the introduction and spread of the virus in the facility. (Ex. B, Ake Aff. ¶ 43 (ECF No. 91-9)). While minimizing the impact of COVID-19 on staff and the facility is a legitimate penological interest, the record illustrates that the WCDC had another method at its disposal for providing inmates' access to books and literature: the WCDC tablets. There is a material fact dispute, however, about whether the tablet system serves as a reasonable alternative considering the limitations on inmates' access to the tablet/kiosk system. And again,

18

it is unclear whether inmates can purchase reading material directly from the publisher. Ostensibly, such a policy would allow interested inmates to obtain reading materials (at their own cost) and require from the WCDC nothing more than what they are required to do when screening donated books from libraries or other "similar entities."   These factual disputes preclude the undersigned from finding, as a matter of law, that the WCDC policy on inmates' access to books and literature is reasonable under *Turner*.  *See Human Rights Defense Center v. Baxter Cnty., Arkansas*, 360 F.Supp.3d 870, 877 (W.D. Ark. 2019) (denying summary judgment because analysis of the *Turner* factors depends upon factual disputes which are inappropriate for the court to resolve on summary judgment).

### 2.  Religious Materials

The Court now pivots to consider the WCDC policy on inmates' access to religious materials.  As a threshold matter, the undersigned believes there is a factual dispute as to what WCDC policy requires.

### a.  WCDC Policy as Described in the WCDC Handbook versus as Described by Defendant Ake

As noted above, according to the WCDC Handbook, "Clergy members are *prohibited* from paying bills, *delivering mail, notes*, *books*, *papers*, *other material* or co-sign bonds." (Ex. A-11, Washington County Detention Center Handbook: Rules and Regulations for Detainees at 2 (ECF No. 91-8)) (emphasis added).  For his part, Plaintiff asserts that "[f]rom November 18, 2021, until late 2022 the jail staff refused to deliver the religious materials provided by the chaplains." (Scharnhorst Aff. ¶ 3 (ECF No. 101)).  According to Plaintiff, he "made countless requests to the chaplains for the materials, which they acknowledged and alerted the jail staff." *Id.* "The jail staff did not deliver these materials and refused to allow the chaplains to deliver

them." *Id.*   Plaintiff also asserts that "[f]rom November 18, 2021, to January 17, 2023, it was

nearly impossible to get the book cart. On the very few occasions that the book cart was provided

the only books on the book cart were various copies of the Bible." *Id.* ¶ 2.

Defendant Ake, by contrast, testifies in his Affidavit that "[r]eligious materials are

available to detainees in the WCDC through the volunteer chaplains at the WCDC. Detainees

may communicate with the chaplains via the kiosk or tablets, or sometimes in person, and can ask

for specific materials, religions, or subject matter. *If the chaplains are able to obtain the*

*information by donation or by locating free resources, they will then share the requested*

*materials with the detainee.*" (Ex. B, Ake Aff. ¶ 45 (ECF No. 91-9)) (emphasis added).  Defendant

Ake's understanding of WCDC policy regarding inmates' access to religious materials is further

reflected in his July 6, 2022, response to Plaintiff's grievance. Specifically, on June 30, 2022,

Plaintiff wrote:

> I have been requesting religious material and a King James bible for over a month.
> I appreciate Chaplain Adams' efforts but I don't feel that he is meeting the needs
> of the detainee population.  I am requesting that we be granted access to religious
> materials like "In Touch" and "The Daily Bread" on a consistent basis.

On July 6, 2022, Defendant Ake responded:

> Sir The Chaplain is doing what he can to get religious materials donated to the
> sheriffs office.  Currently if you would to read the bible the tablets have a library
> on them and the bible is one of the books you can read from that library.  I'm sure
> when the chaplains get enough bibles donated *they will bring you the bible you*
> *requested*.

(Ex. A-2, Requests and Grievances at 23 (ECF No. 91-3)) (emphasis added).

Thus, there is a fact dispute about whether WCDC policy permits clergy to provide

religious materials *directly* to the inmate, or whether clergy are required to give the materials to

WCDC officials who, in turn, then give them to the inmates.  This factual dispute alone is

sufficient to preclude Defendants' summary judgment. But, as analyzed in detail below, neither policy – one that allows inmates to obtain religious materials directly from chaplains nor one that requires inmates to obtain religious materials from WCDC staff – are reasonable under *Turner* as a matter of law.

> **b.** ***Turner* Analysis**

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). But this right is not without limitation. In determining whether prison regulations violate the free-exercise clause, federal courts "consider first the threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief,' and then apply the *Turner* factors to determine if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives." *Murphy*, 372 F.3d at 983 (internal citation omitted).

The record illustrates that on June 30, 2022, Plaintiff specifically requested copies of "In Touch," "the Daily Bread," and a copy of the King James Bible. (Ex. A-2, Requests and Grievances at 23 (ECF No. 91-3). Whether seeking access to this specific religious material and this specific version of the Bible reflects a sincerely held belief is a factual determination; accordingly, this Court declines to consider on summary judgment whether Plaintiff's belief is genuine. *Murphy*, 372 F.3d at 983 (declining to consider whether group worship is a sincerely held belief on summary judgment because it is a factual determination) (citing *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996)). The Court will apply the *Turner* factors in considering whether the WCDC's *method* of access to this material warrants summary judgment.

### i.      WCDC Written Policy

First, assuming WCDC's written policy prohibiting clergy from providing religious materials directly to inmates is rationally connected to the WCDC's legitimate governmental interest in eliminating introduction of contraband into the facility, Defendant Ake explicitly undercuts this connection, saying that "detainees are less likely to use paper from items that have meaning to them such as religious books, legal mail and journals" for illicit purposes." (Ex. B, Ake Aff. ¶¶ 9 (ECF No. 91-9)).

Regarding the second *Turner* factor, there is a material fact dispute about whether there are *alternative* means of obtaining religious materials at the WCDC rather than obtaining them directly from the chaplains. Indeed, there is a factual question about whether detainees can obtain any religious materials at all. For example, Plaintiff asserts that "[f]rom November 18, 2021, until late 2022, the jail staff refused to deliver the religious materials provided by the chaplain." (Scharnhorst Aff. ¶ 3 (ECF No. 101)). Although various copies of the Bible were available on the "book cart," there is no dispute that this "cart" was often stationary. *Id.* ¶ 2; *compare* (Ex. B, Ake Aff. ¶  43 (ECF No. 91-9)). Thus, there is a question of material fact whether these Bibles were, in fact, *available* to the detainees. Defendant Ake claims that "[t]here is a collection of free books, including various religious materials, that are available on the tablets in the WCDC," (Ex. B, Ake Aff. ¶ 44 (ECF No. 91-9)), as noted above, however, there is a question of material fact about whether the tablet system is an adequate "alternative," considering that detainees may only access the tablets for "free" for 15 minutes every three hours, the "tablet-to-detainee" ratio is unknown, and Plaintiff asserts that he was on "23/1 lockdown" during most of his incarceration at the WCDC. (Scharnhorst Aff. ¶ 2 (ECF No. 101)).

22

The Court notes that "[a] prisoner need not be afforded his preferred means of practicing his religion so long as he is afforded sufficient means to do so." *Murphy*, 372 F.3d at 983.   In this case, Defendant Ake asserts that "[d]etainees may communicate with the chaplains via the kiosk or tablets, or sometimes in person, and can ask for specific materials, religions, or subject matter." (Ex. B, Ake Aff. ¶ 45 (ECF No. 91-9)).   Defendant Ake also says that "Chaplains often share materials by typing or pasting them into their communication with detainees on the kiosk/tablets." *Id.* ¶ 46.   But for the reasons described above, there is a factual dispute about whether detainee access to the tablets or kiosk is an "available" alternative, considering the limitations on inmates' "free" access to the kiosk and tablets.   The record before the Court is void of any information as to when or how often chaplains are available to meet with inmates "in person."   For these reasons, the undersigned cannot find, as a matter of law, that the WCDC written policy on inmates' access to religious materials is reasonable under *Turner*.

### ii.   Religious Materials Policy as Described by Defendant Ake

For similar reasons, the Court cannot conclude the WCDC policy on inmates' access to religious materials as described by Defendant Ake is reasonable under *Turner*.   Defendant Ake claims that inmates can receive religious materials directly from clergy when they are available. (Ex. B, Ake Aff. ¶ 45 (ECF No. 91-9)).   According to Defendant Ake, "[a]lthough it has happened, [the WCDC has] seen that detainees are less likely to use paper from religious materials in ways that threaten the security of the other detainees, staff, or the facility." *Id.* ¶ 46. Considering that the WCDC apparently is less concerned that inmates will use religious materials for illicit purposes, it is unclear under the first *Turner* factor, what, if any, penological interest is being served by requiring inmates to obtain religious materials directly from clergy as opposed

23

to allowing them to obtain such materials directly from the publisher or through family or friends. Regarding the second *Turner* factor, moreover, there is a material fact dispute about whether inmates are allowed *any* access to religious materials, particularly considering limitations on access to the "book cart," which ostensibly contains various copies of the Bible, limitations on access to the tablet/kiosk system, and, as Plaintiff asserts, when WCDC staff obtain religious materials from clergy, they refuse to distribute it to the requesting inmate.

### c.  Summary

In sum, there is a fact dispute surrounding *how* the WCDC makes religious material available to WCDC detainees.  Further, regardless of whether the WCDC policy requires clergy to provide religious materials directly to inmates or the policy requires clergy to provide that material to WCDC staff who, then, provide it to detainees, factual disputes preclude the undersigned from determining, at the summary judgment stage, whether either policy is reasonable under *Turner*.

### 3.  Daily Newspaper

This leaves WCDC's policy on inmates' access to the daily newspaper.  The Constitution, among other things, "protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972).  Federal courts have previously found that "there is no basis for total restrictions on prisoners' access to the news in view of their clear First Amendment rights." *Kemp v. Petray*, Case No. 07-CV-5056, 2009 WL 2709921 at * 5 (W.D. Ark. Aug. 26, 2009) (listing cases); *see also Rowland v. Jones*, 452 F.2d 1005 (8th Cir. 1971) (prison authorities' denial of access to newspaper "Muhammad Speaks" violates prisoners' First Amendment rights).  This Court, then, considers whether the WCDC policy on inmates' access to the daily newspaper is

reasonable under *Turner*.

The portions of the WCDC Detainee Handbook in the summary judgment record do not address the WCDC's policy on detainees' access to the daily newspaper. *See* (Ex. A-11, Detainee Handbook (ECF No. 91-8)).   Defendant Ake, however, asserts that as Captain, his "responsibilities are managing the daily operations of the jail and the employees of the detention center" and that he is "familiar with the history, policies, and practices of the WCDC." (Ex. B, Ake Aff. ¶¶ 2-3 (ECF No. 91-9)).  And, according to Defendant Ake, "[i]t has been a part of the daily operations at the Washington County Detention Center for the last few years for staff (usually the shift Lieutenant) to upload the digital version of the newspaper early in the morning each day." *Id.* ¶ 23.   Further, Defendant Ake explains that "[b]ecause the annual [digital] subscription is budgeted and appropriated by the Washington County Quorum Court based on the prior years' experience, there is no other money budgeted/appropriated for use on newspapers than the amount of the annual subscription." *Id.* ¶ 22.  The Court applies the *Turner* factors to the policy described by Defendant Ake.

As noted elsewhere, the first *Turner* factor requires a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 90-91.  Defendant Ake asserts that the WCDC policy of only purchasing a "digital subscription" to the daily newspaper has helped to reduce the introduction of "loose" paper into the facility.  (Ex. B, Ake Aff. ¶ ¶ 7-12) (ECF No. 91-9)).  Defendant Ake contends that loose paper has been used to "defeat locks . . . impair ventilation . . . flood cells . . . to conceal contraband . . . and to make weapons." *Id.* ¶ 8.  According to Defendant Ake, the reduction of loose paper in the facility has "primarily helped to facilitate better sanitation by reducing the

25

amount of trash that is produced every day and which must be disposed of every day . . . Reduction in the amount of loose paper in the jail and the corresponding reduction in the amount of trash created and which must be disposed of also results in a cost savings tied to the personnel necessary for cleanup and removal of the trash." *Id.* ¶ 10.

Plaintiff counters that the "Defendants don't care about safety or sanitation." (Scharnhorst Statement of Disputed Fact ¶ 126 (ECF No. 102)).  In support of this statement, Plaintiff points to grievances and surveillance videos describing exposed electrical wiring, piles of trash, and graffiti.  *Id.*  Plaintiff's claim, however, does not detract from the fact that the WCDC has, in the Court's view, a legitimate governmental interest in maintaining a safe and sanitary facility.  The WCDC's level of success in maintaining a clean and safe institution is not an issue before the Court.  Further, the Court finds that WCDC's policy in eliminating the introduction of physical newspapers from the facility is rationally connected to its legitimate interest.

Since a physical newspaper is not available to Plaintiff, the Court next considers the second *Turner* factor: whether alternative means are available for Plaintiff to assert his First Amendment right to access to the news.  Again, while alternative means of asserting this right do not need to be "ideal," they do need to be "available." *See Human Rights Defense Ctr.*, 999 F.3d at 1165.  "If the alternative means are illusory, impractical, or otherwise unavailable, this would weigh in favor of [the plaintiff] under the second *Turner* factor." *Id.*

Defendant Ake asserts that "[i]t has been a part of the daily operations at the Washington County Detention Center for the last few years for staff (usually the shift Lieutenant) to upload the digital version of the newspaper early in the morning each day." (Ex. B, Ake Aff. ¶ 23 (ECF No. 91-9)).  "While there are days that the upload may occur later in the day, there have been

26

fewer delays in delivery of the newspaper to the detainees since switching to the digital version and access was not limited during COVID as it was in other facilities. If an upload is missed for any reason, staff makes every attempt to upload it as soon as possible." *Id.*  Further, according to Defendant Ake, making the daily newspaper available to detainees electronically "made the newspaper available to more detainees (at the same time) at a substantially reduced cost to the County." *Id.* ¶ 20.

Plaintiff disputes these assertions.   According to Plaintiff, officers upload the newspaper "sometimes." (Statement of Disputed Facts ¶ 7 (ECF No. 102)).  Plaintiff alleges that staff is inconsistent in identifying the daily newspaper when uploaded, causing the "newspapers to be listed in a nearly random order [] creat[ing] the 'chaos index.'" *Id.* ¶ 8.  According to Plaintiff, inmates "sometimes [] can access the newspaper **if** tablets are available and not being hoarded, essentially 'owned' by preferred inmates, **if** they can access the one kiosk provided to serve up to 70 inmates at one time." *Id.*

In the context of the First Amendment, federal courts have routinely held that isolated, short-term delays do not give rise to a constitutional violation. *See, e.g. Gardner v.* Howard, 109 F.3d 427, 431 (8th Cir. 1997) ("an isolated incident, without any evidence of improper motive or resulting interference with the inmate's right to counsel or to access to the courts, does not give rise to a constitutional violation"); *Siezemore v. Williford*, 829 F.2d 608, 610-11 (7th Cir. 1987) ("merely alleging an isolated delay or some other relatively short-term, non-content-based disruption in the delivery of inmate ready material will not support . . . a cause of action grounded upon the First Amendment").  Here, however, there is a fact dispute about the number of times the daily newspaper was not uploaded on the day of its publication or otherwise "available" to

Plaintiff during the timeframe alleged in the Complaint.

Defendants assert that Newspaper Index shows that during this timeframe, "a newspaper was uploaded to the kiosk for inmates to read every day with the exception of 8 days where a newspaper was not uploaded, 2 days were the newspaper was not uploaded a day late, and 4 days where the newspaper was uploaded more than one day late." (Statement of Indisputable Material Facts ¶ 3 (ECF No. 91) (citing Ex. A-8, Newspaper Index (ECF No. 91-5)). But Plaintiff says that:

> Between November 18, 2021 and July 15, 2023, the newspaper was not uploaded on at least 9 days including 11/19/21, 12/24/21, 12/25/21, 02/06/22, 03/13/22, 03/26/22, 05/06/22, 05/15/22, 06/26/22; was uploaded more than one day late on at least 5 days including 01/03/22 uploaded 01/06/22, 04/09/22 uploaded on 04/13/22, 05/29/22 uploaded 06/01/22, 06/08/22 uploaded 06/16/22, 07/3/22 uploaded 07/06/22; was not 'available' due to being mislisted at least 9 days including 12/22/21, 12/23/21, 01/06/22, 01/08/22, 02/19/22, 02/24/22, 03/27/22, 07/13/22, 7/14/22; was not uploaded until after [he had] lodged a complaint and after [his] hour out, which was the only opportunity [he] had to read the newspaper on at least 2 days including 06/01/22, 07/01/22; and was uploaded a day late at least 2 days 05/31/22 uploaded 06/01/22, 06/03/22 uploaded on 06/04/22.

(Statement of Disputed Facts ¶ 2 (ECF No. 102)).

For the purposes of summary judgment, therefore, the Court cannot say, as a matter of law, that disruptions in uploading the newspaper on the date of publication were "sporadic" or "isolated." [10]

---

[10] Defendants claim that the allegations here are analogous to *Morgan v. Rothe*, Case No. 5:21-CV-05114, 2022 WL 9799601 (W.D. Ark. July 21, 2022), *report and recommendation adopted by* 2022 WL 4355141 (W.D. Ark. Sept. 20, 2022). In *Morgan*, Plaintiff argued that the defendants violated his First Amendment rights when he did not have access to the newspaper on the WCDC tablet/kiosk system for a month and he was not given a physical copy of the newspaper upon his request. *Id.* at * 15. In rejecting that argument, Magistrate Judge Ford found that "[t]emporary problems with newspaper access caused by a computer software upgrade do not violate the First Amendment." *Id.* Further, Magistrate Judge Ford found that "[plaintiff] has not alleged that any policy or custom of Washington County caused the temporary interference with his ability to read the newspaper." *Id.* at * 16. Here, by contrast, as the Court understands it, Plaintiff claims that

28

Further, even if the undersigned found delays in uploading the newspaper to be "sporadic" and the days it was unavailable "limited," the Court cannot find, as a matter of law, that the "tablet/kiosk" system *itself* provides a reasonable alternative to providing the physical newspaper, particularly considering the inconsistent manner in which the newspaper is labeled on the kiosk and the limitations on inmates' free access to the kiosk and tablets.  The Court finds, for example, that even if the newspaper was uploaded on the day of publication (and it is undisputed that this was not always the case), inmates are only allowed to access the kiosk for thirty minutes every fifteen minutes and to access the tablets for fifteen minutes every three hours "for free." (Ex. C, McKinley Aff. ¶ 7 (ECF No. 91-10)).  Although Defendant Ake asserts that uploading a digital version of the newspaper makes it "available to more detainees (at the same time)," (Ex. B, Ake Aff. ¶ 20 (ECF No. 91-9)), Plaintiff maintains that one kiosk may serve up to 70 inmates. *See* (Scharnhorst Statement of Disputed Facts ¶7 (ECF No. 102)).  There is nothing in the summary judgment record suggesting that this ratio of inmates to physical newspapers provided a reasonable opportunity for inmates to access the news (which is not an issue before the Court), let alone that the alleged ratio of inmates to kiosks (or inmates to tablets)  currently provides a reasonable opportunity for interested inmates to access the news.

Finally, there is material fact dispute about whether inmates can access news and information outside of the WCDC kiosk/tablet system.  Defendant Ake says that "[s]ome housing units also have access to a television area of the unit. These televisions often show local or national news.  The channels on the televisions are changed regularly to allow for viewing of a

the WCDC policy of exclusively making the daily newspaper available on the tablet/kiosk system violates his First Amendment rights.  The Defendants' reliance on *Morgan* is therefore misplaced.

variety of channels and viewpoints." (Ex. B, Ake Aff. ¶ 31 (ECF No. 91-9)).  But Plaintiff claims "there is **<u>NO TV</u>** in Q-block, where [he] was housed, or any of the other 23/1 lockdown blocks were [he] spent the overwhelming majority of [his] stay, or in ISO-1 or ISO-4 where [he] spent 61 days." (Scharnhorst Aff. ¶ 55D (ECF No. 102)).  Thus, there is a fact genuine fact dispute about whether Plaintiff had access to a television.

The Court additionally notes that there is *no* admissible evidence in the summary judgment record suggesting that WCDC inmates are permitted to obtain the newspaper directly from the publisher or some other source.[11] Accordingly, there is a material fact dispute about whether the WCDC's policy offering electronic access to the daily newspaper is, in fact, an available alternative to allowing inmates physical copies of the newspaper or simply "illusory," particularly, where, as here, there is a material fact dispute about the limitations of inmates' access to the kiosk/tablet system and the number of times the WCDC fails to upload or otherwise "make the newspaper accessible" to inmates.[12]  The Court finds, therefore, that these fact disputes – along

---

[11] Indeed, the summary judgment record includes an exchange from October 4, 2022, between Plaintiff and WCDC Cpl. Tom Mulvaney (who is not a party to this action).  *See* (Ex. A-2, Requests and Grievances, pp. 60-61 (ECF No. 91-3)).  In that exchange, Cpl. Mulvaney explains that the WCDC stopped the practice of allowing detainees to order newspaper subscriptions "years ago." *Id.*  According to Cpl. Mulvaney, "[a] lot, or the biggest reason was due to detainees using the paper to cover lights, making contraband, and just safety and security reasons in general." *Id.*  Because this exchange took place outside of the timeframe alleged in the Complaint and Cpl. Mulvaney is not a party to this action, the Court does not consider this exchange for the truth of the matter asserted, i.e. that WCDC policy prohibits detainees from purchasing newspaper subscriptions directly from the publisher.  Instead, the Court finds there is an absence of admissible facts in the record suggesting that detainees are permitted to access the newspaper outside of the WCDC kiosk/tablet system.

[12] Further, the Court cannot conclude, as a matter of law, that the third and fourth *Turner* factors weigh in favor of WCDC's policy of making the newspaper available on the electronic kiosk/tablet system.  As the Court understands Defendants' argument, under the third *Turner* factor, Defendants would contend that if inmates were allowed to purchase their own subscription to the newspaper, this would have a "significant ripple effect" on the operations of the WCDC

with  fact disputes surrounding WCDC's policies on inmates' access to books and literature and religious materials – preclude summary judgment.

### 4.  Summary

In sum, after careful review of the summary judgment record, material fact disputes preclude the undersigned from finding, as a matter of law, that WCDC policies on inmates' access to books and literature, religious materials, and the daily newspaper are reasonable under *Turner*.

### B.  Individual and Official Capacity Claims

"Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 535 (8th Cir. 1999) (citing *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).  Here, Plaintiff has named each defendant in both that person's individual and official capacity.  This Court first considers Plaintiff's official capacity claims.

### 1.  Official Capacity Claims

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Thus, in this case, the Court treats Plaintiff's official capacity claims as claims against Washington County itself.  A governmental entity such as Washington County is liable "under § 1983 only when the entity itself is 'the moving force' behind the deprivation." *Id.* at 166.  In an official-capacity suit, therefore, "the entity's 'policy or custom' must have played a part in the violation

---

because it would create or contribute to the "loose paper problems" described by Defendant Ake. But the Court fails to see how expanding the amount of time inmates have "free" access to the tablet/kiosk system or expanding the number of "tablets" or "kiosks" per inmate would lead to these same concerns.

of federal law." *Id.* (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1974)).

As described in detail above, there is a material fact dispute about whether the WCDC's policies on inmates' access to books and literature, religious materials, and the daily newspaper are reasonable under the First Amendment. "When a plaintiff can point to a municipal policy that either 'violates federal law, or directs an employee to do so,' 'no evidence is needed other than a statement of the municipal policy and its exercise' to establish a constitutional violation." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (citing *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389, 90 (8th Cir. 2007) (additional citations omitted)).  Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's official capacity claims – related to the implementation of WCDC policies on inmates' access to books and literature, religious materials, and the daily newspaper – should be **DENIED**.

### 2.  Individual Capacity Claims

The Court now turns to Plaintiff's individual capacity claims.  "Suits against officials in their individual capacity seek to impose personal liability upon a government official for actions he takes under color of state law."  *Handt v. Lynch*, 681 F.3d 939, 943 (8th Cir. 2012) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  To establish liability against officials in their individual capacity, "the plaintiff must show that the official, acting under color of state law caused the deprivation of a federal right."  *Id.* at 943 (citing *Graham*, 473 U.S. at 166) (emphasis added); *see also Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.").

Even so, such "[i]ndividual defendants are entitled to qualified immunity unless their

alleged conduct violated 'clearly established statutory or constitutional rights of which a reasonable person [in his position] would have known." *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003). At summary judgment, "the burden remains on the proponent of the immunity to establish the relevant predicate facts, and [. . .] the nonmoving party is given the benefit of all reasonable inferences." *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000). "In the event that a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground." *Id.* (internal citation omitted). But "once the predicate facts have been established, for the purposes of qualified immunity . . . the conduct was either 'reasonable under settled law in the circumstances [ ] or it was not . . . and this is a determination of law that should be made at the earliest possible stage in litigation." *Id.* (internal citations and quotations omitted).

### a.   Claim 1: "Nolan Ake and Kevin East have denied my requests and grievances regarding receiving literature, news and religious materials."

Plaintiff first alleges that "Nolan Ake and Kevin East have denied [his] requests and grievances regarding receiving literature, news, and religious materials." (Comp. at 6 (ECF No. 1). In response, and as a threshold matter, Defendants assert that responding to a grievance does not create a basis for liability. (Mtn. for Summ. J. at ¶ 6(d) (ECF No. 89)). This Court agrees. "A prison grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates." *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam) (internal quotation omitted). Accordingly, to the extent that Plaintiff claims that Defendants Ake and East violated his constitutional rights in denying *grievances*, this Court agrees with Defendants that such a claim is not, by itself, sufficient to establish a constitutional violation as a matter of law. *See Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam).

But this reading only considers half of Plaintiff's claim:  Plaintiff also challenges the decisions made by Defendants Ake and East to deny his *requests* for literature, news, and religious materials. *See* (Comp. (ECF No. 1)); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam) (pro se litigant's allegations are to be liberally construed).

There are no facts in the record that Defendants Ake and East *personally* refused to provide him with books and literature, religious materials, or the daily newspaper.[13] *See* (Comp. (ECF No. 1)); (Scharnhorst Aff. (ECF No. 101)).  But, as supervisors, Defendants Ake and East may nevertheless "be held individually liable under § 1983 if [they] directly participate[] in a constitutional violation or if a failure to properly supervise and train the offending employee[s] caused a deprivation of constitutional rights." *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).  Direct action "may be found if the supervisor is 'involved in creating, applying, or interpreting a policy that gives rise to unconstitutional conditions." *Parada v. Anoka Cnty.*, 481 F.Supp.3d 888, 904 (D. Minn. 2020).  Under the "failure to train or supervise" theory, the supervisor is "entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)).

i.    **Defendant Ake**

Defendant Ake is a Captain in the Washington County Sheriff's Department, serving in

---

[13] Although there are facts in the record showing that Defendants Ake and East uploaded the newspaper on certain days, there are no facts in the record—disputed or otherwise—showing that Defendant Ake and East were responsible for uploading the newspaper on the days it was not available on the kiosk/tablet system. *See, e,g.*, (Ex. A-2, Requests and Grievances, pp. 10, 15 (ECF No. 91-3)).

the Washington County Detention Center (WCDC).  (Ex. B., Ake Aff. ¶ 1 (ECF No. 91-9)).

Defendant Ake has been "employed by the Washington County Sheriff's Office since 2005 and

[has] worked in the detention center for 18 years." *Id.* ¶ 2.  He is "familiar with the history,

policies, and practices of the WCDC."  *Id.*  As the Captain of the WCDC, he is responsible for

"managing the daily operations of the jail and the employees of the detention center."  (Ex. B,

Ake Aff. ¶ 3 (ECF No. 91-9)).  Further, the record shows, for example, that in response to

Plaintiff's request for religious materials, Defendant Ake told him:

> Sir The Chaplain is doing what he can to get religious materials donated to the
> sheriffs office.  Currently if you would to read the bible the tablets have a library
> on them and the bible is one of the books you can read from that library.  I'm sure
> when the chaplains get enough bibles donated they will bring you the bible you
> requested.

(Ex. A-2, Requests and Grievances at 23 (ECF No. 91-3)) (emphasis added).

> On July 6, 2022, Plaintiff submitted the following grievance:

> Current policy regarding news, literature and religious study materials violates the
> civil rights of the detainees house here, including myself. I would like to be able to
> receive news sources of my own choosing as well as media publications such as
> magazines and newsletters, religious materials and literature of my own choosing
> so long as it does not present a danger to the people here or threaten the security of
> the facility.  The current policy being inforced [sic] is over-reaching and not done
> for security purposes, but instead serves as a punishment and a violationg [sic] of
> our rights and I would like it to be revised in compliance with the law.

> *Id.* at p. 28.

In response, Defendant Ake wrote:

> Sir our policy does not violate your civil rights.  There are books on the kiosk and
> books on the book cart the newspaper is placed on the kiosk daily and there is a tv
> playing in you block during the day.

> *Id.*

> When viewed in the light most favorable to the Plaintiff, the Court finds that this evidence

could lead a factfinder to conclude that Defendant Ake was directly involved in overseeing the

35

implementation of WCDC policies related to detainees' access to books and literature, religious materials, and the daily newspaper. *See Elder v. Gillespie*, 54 F.4th 1055, 1065 (8th Cir. 2022) (plaintiff alleged sufficient facts that defendants were involved in "creating, applying or interpreting" policy to survive motion to dismiss); *see also Jackson v. Nixon*, 747 F.3d 537, 545 (8th Cir. 2014) (explaining that personal liability under § 1983 can be established by showing that the defendant was "directly involved in making, implementing or enforcing a policy decision that 'created unconstitutional conditions.'") (quoting *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1984)).

The question then is whether Defendant Ake is entitled to qualified immunity for this role. As described in detail above, material fact disputes preclude this Court from determining (at the summary judgment stage) whether the WCDC's policies in inmates' access to books and literature, religious materials, and the daily newspaper are reasonable under *Turner. See supra* IV.A. Because these predicate facts have not been established, Defendant Ake is not entitled to qualified immunity at this stage of the litigation. *See Pace*, 201 F.3d at 1056.

The Court notes, moreover, that even if WCDC's policy on inmates' access to books and literature, religious materials, and the daily newspaper are ultimately determined to be unconstitutional, Defendant Ake is nevertheless entitled to qualified immunity unless Plaintiff's constitutional right was clearly established at the time of the deprivation. *Howard v. Kansas City Police Dept.*, 570 F.3d 984, 988 (8th Cir. 2009). Under this prong of the analysis, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 991 (internal citation omitted).

Only for the purposes of summary judgment, given the established law during the

timeframe in question (November 2021—July 2022), the undersigned finds a reasonable officer would recognize that the WCDC's policies on inmates' access to books and literature, religious materials, and the daily newspaper violate the First Amendment.  "The Supreme Court has twice warned that 'a de facto permanent ban' on inmate access to communications with outsiders would present a serious constitutional issue." *Human Rights Defense Center v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1165 (8th Cir. 2021) (citing *Beard v. Banks*, 548 U.S. 521, 535 (2006) and *Overton v. Bazzetta*, 539 U.S. 126, 134 (2003)).

When viewed in the light most favorable to Plaintiff, the facts show that the WCDC policy limiting book donations from libraries and other similar entities operates as a de facto ban on inmates' access to books and literature where, as here, the existence of the book cart is not well-known among WCDC staff; libraries and similar entities have not been regularly donating books and literature to the book cart; the book cart has been mostly stationary since March 2020; and inmates cannot purchase digital books.

Similarly, when viewed in the light most favorable Plaintiff, the facts tend to illustrate that WCDC's policy on allowing inmates access to religious materials similarly operates as a ban, considering the limitations on inmates' access to the kiosk/tablet system; Plaintiff's assertion that WCDC staff will not deliver the religious materials provided by clergy for distribution; the limitations on inmates' access to the book "cart;" and the absence of any facts suggesting that inmates may obtain religious materials from any other source, such as directly from a publisher or outside clergy.

Finally, inmates' access to the daily newspaper may constitute a de facto ban considering the inmates' limited access to the tablet/kiosk system; the inconsistencies in how staff label the

newspapers; and the policies prohibiting inmates from obtaining news from outside sources, such as purchasing an outside subscription to the newspaper.[14] Accordingly, for the purposes of summary judgment, the undersigned recommends that Defendant Ake's Motion for Summary Judgment on the basis of qualified immunity (for denying Plaintiff's requests for books and literature, religious materials, and the daily newspaper) should be **DENIED**.

      ii.     **Defendant East**

The analysis of Defendant East's Motion leads to a different conclusion.

First, under the direct-action theory of individual liability, there are no facts – undisputed or otherwise – establishing that Defendant East was involved in creating, applying, or interpreting WCDC policies on inmates' access to books and literature, religious materials, or the daily newspaper.

Second, current Arkansas state law provides that the *county sheriff* is responsible for the supervision of the county jail and that the county sheriff "may appoint a jailer for whose conduct he or she shall be responsible." Ark. Code Ann. § 12-41-502; *see also Messimer v. Lockhart*, 702 F.2d 729, 732 (8th Cir. 1983) (8th Circuit has found the director of corrections "responsible for his failure to act" based on his statutory duty to administer the Department of Corrections and his authority to change the challenged policies).   Here, Defendant East is not the sheriff, and there are no facts suggesting that Defendant East's responsibilities include drafting or executing policy.

---

[14] These circumstances, therefore, are distinguishable from *Beard v. Banks*, 548 U.S. 521 (2006). In that case, the Supreme Court found that prison policies prohibiting inmates confined to a "level 2" unit from "all access to newspapers, magazines, and photographs" was reasonable under *Turner*, in part, because through "good behavior" those prisoners could earn access to that material. *Id.* at 531.  Here, by contrast, there are no facts suggesting that WCDC policies are tied to the pretrial inmate's classification.

This leaves the argument that Defendant East is personally liable under a theory of failure to supervise or train. To recover under this theory, Plaintiff must establish that the supervisor: "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [the plaintiff]." *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019) (quoting *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018)).

Here, it is undisputed that sometime during the week preceding July 6, 2022, Plaintiff "sent letters to Cantrell, Denzer and East [] asking that they re-evaluate current policy regarding detainees' access to news, literature, and religious materials." (Defendants' Statement of Indisputable Material Facts ¶ 57 (ECF No. 91)). But there are no facts in the summary judgment record showing that Defendant East is responsible for training or supervising subordinates. *See Armstrong v. City of Minneapolis*, 525 F. Supp. 3d 954, 966 (D. Minn. 2021) (dismissing failure to supervise or train claim against the chief of police because plaintiffs "have not plausibly alleged that [the chief] was responsible in the supervision and training of the [] officers involved in the violation of Plaintiffs' rights"). Further, and more to the point, there is no evidence in the record showing that Defendant East's "failure to train or supervise" *caused* the constitutional violation. Indeed, Plaintiff claims that the WCDC policies themselves caused the constitutional injury. Accordingly, the undersigned recommends that Defendants' Motion for Summary Judgment with respect to Plaintiff's claim against Defendant East in his individual capacity (for denying him access to books and literature, religious materials, and the daily newspaper) be **GRANTED**.

      **b.**    **Claim 2: "Randall Denzer, Jay Cantrell, and Kevin East have refused to modify current policy to allow for access to literature, news and religious materials despite formal written request."**

With respect to Plaintiff's second claim, Plaintiff contends that "Randall Denzer, [Sheriff]

Jay Cantrell, and Kevin East have refused to modify current policy to allow for access to literature, news and religious materials despite formal written request." (Comp. at 6 (ECF No. 1)).  As the Court understands it, Plaintiff seeks to establish liability against these Defendants with respect to this claim because of their role as supervisors.

As previously noted, in the section 1983 context "supervisor liability is limited." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).  "A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." *Id.* (citing *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994)).  Instead, "a supervisor [] may be held liable under § 1983 if he directly participated in the constitutional violation or if his failure to train or supervise the offending actor caused the deprivation." *Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 806-07 (8th Cir. 1994) (internal citations omitted).

### i.     Defendants Cantrell and Denzer

Starting first with Defendants [Sheriff] Cantrell and Denzer, Plaintiff contends that these defendants "enforce a policy which prevents newspapers, magazines, books and religious materials from being ordered by detainees." (Comp. at 6 (ECF No. 1)).  Although Defendants argue that there is no evidence of direct involvement by Defendants Cantrell and Denzer, *see* (Mtn. for Summ. J. ¶ 6(c) (ECF No. 89)), Defendants present no facts disputing that Defendants Cantrell and Denzer enforced such a policy. *See* (Defendants' Statement of Indisputable Facts (ECF No. 91)).  Thus, the Court finds that a reasonable jury could conclude that Defendants Cantrell and Denzer were directly involved in the enforcement of these policies. *See Elder*, 54 F.4th at 1065.

The question, then, is whether Defendants Cantrell and Denzer are entitled to qualified

immunity as a matter of law for this involvement.  As noted above, the defendants are "entitled to qualified immunity unless Plaintiff's constitutional right was clearly established at the time of the deprivation." *Howard*, 570 F.3d at 988.  Under this prong of the analysis, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 991 (internal citation omitted). Here, as noted above, a material fact dispute precludes this Court from concluding, as a matter of law, that WCDC policies are reasonable under *Tuner*.  Thus, Defendants Cantrell and Denzer are not entitled to qualified immunity at this stage of the proceedings.

ii.     **Defendant East**

This leaves Defendant East. Plaintiff offers no facts about Defendant East's purported involvement in enforcing a policy preventing WCDC detainees from obtaining books and literature, religious materials, or the daily newspaper directly. (Comp. (ECF No. 1)). Further, as noted above, there are no facts that Defendant East is responsible for training or supervising subordinates or that his failure to do so *caused* the constitutional violation. *Id.*

iii.    **Summary**

In sum, this Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's individual capacity claims against Defendants Cantrell and Denzer (for enforcing a policy prohibiting WCDC inmates from obtaining books and literature, religious materials, and the daily newspaper from outside the facility) be **DENIED**. However, this Court recommends that Defendants' Motion for Summary Judgment with respect to Plaintiff's claim against Defendant East (for the same underlying conduct) be **GRANTED**.

c.     **Claim Three: "Nolan Ake and Amanda Arnold Have Failed To Consistently Provide the Local Newspaper or To Implement a Procedure To Ensure that the Newspaper Be Provided On A Consistent Basis and Organized Fashion Despite Numerous Requests and Grievances."**

Finally, Plaintiff asserts that "Nolan Ake and Amanda Arnold have failed to consistently provide the local newspaper or to implement a procedure to ensure that the newspaper be provided on a consistent basis and organized fashion despite numerous requests and grievances." (Comp. (ECF No. 1)). Plaintiff claims that these Defendants "observe a policy which fails to ensure consistent organized access to the newspaper via the kiosk system." *Id.*

As a threshold matter, this Court observes that Plaintiff's third claim is distinguishable from his first: the first claim asserts that Defendant Ake (for one) denied his requests for books

42

and literature, religious materials, and the daily newspaper.  (Comp. (ECF No. 1)).  As described in detail above, the Court views this claim as asserting that Defendant Ake, as supervisor at the WCDC, is directly responsible for violating Plaintiff's constitutional rights because he is directly involved in implementing and overseeing those policies.  This Court recommends denying Defendants' Motion for Summary Judgment as to that claim on this basis. *See supra* IV.B.2.a.i.

As the Court understands this claim, Plaintiff seeks to attach individual liability against Defendants Ake and Arnold because they "failed to consistently provide the local newspaper." (Comp. (ECF No. 1)).  But Plaintiff does not assert any facts that either Defendant was responsible for uploading the newspaper on the days that it was not available.  Defendant Ake asserts that "it has been a part of the daily operations at the Washington County Detention Center for the last few years for staff (*usually the shift Lieutenant*) to upload the digital version of the newspaper early in the morning each day." (Ex. B, Ake Aff. ¶ 23 (ECF No. 91-9)).  But Plaintiff asserts no facts to suggest that Defendants Ake and Arnold were the only two lieutenants responsible for uploading the newspaper. Indeed, the record would contradict such an assertion. *See generally* (Ex. A-8, Newspaper Index (ECF No. 91-5) (showing that during the timeframe alleged in the Complaint, the daily newspaper was uploaded by Lt. Amanda Arnold, Capt. Kevin East, Lt. Nolan Ake, Lt. Michael Arnold, and, on one occasion, Lt. Atchley).  Further, there are no facts to suggest that Defendants Ake and Arnold were the "shift lieutenants" on duty on the days the newspaper was not uploaded onto the kiosk.  Accordingly, there is no factual dispute to preclude summary judgment on this claim.

This leaves the second half of Plaintiff's claim: that Defendants Ake and Arnold failed to "implement a procedure to ensure that the newspaper be provided on a consistent and organized

fashion despite numerous requests and grievances." (Comp. (ECF No. 1)).  Although Defendant Ake's supervisory responsibilities at the WCDC should preclude summary judgment on the claims related to his implementation and enforcement of WCDC policies, there is no material fact dispute that neither Defendant Ake nor Defendant Arnold is a policy *maker*.  As noted above, Arkansas law provides that the *county sheriff* is responsible for the supervision of the county jail and that the county sheriff "may appoint a jailer for whose conduct he or she shall be responsible." Ark. Code Ann. § 12-41-502.  Further, the Washington County Sheriff's Office, Detention Center S.O.P. provides that "[t]he chief executive shall establish written policy to provide recreation and leisure time activities, library services, social and religious services." (Ex. A-10, Washington County Sheriff's Office, Detention Center S.O.P. at p. 2 (ECF No. 91-7)).  There is no fact dispute that neither Defendant Ake nor Defendant Arnold is the sheriff or "chief executive."  Accordingly, this Court recommends that Defendant's Motion for Summary Judgment with respect to this claim be **GRANTED**.

One final note, since this Court recommends granting summary judgment regarding Plaintiff's claims against Defendants East and Arnold in their individual capacities, this Court similarly recommends dismissing the official capacity claims against those defendants on the grounds that those official capacity claims are duplicative of the official capacity claims that are recommended to survive summary judgment. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (official capacity claims are "functionally equivalent to a suit against the employing governmental entity").

## V.   CONCLUSION

In sum, for the reasons described in detail above, the undersigned recommends that:

(1) Defendants' Motion for Summary Judgment be **GRANTED** with respect to Plaintiff's individual capacity claims against Defendant East and Defendant Arnold;

(2) Defendants' Motion for Summary Judgment be **GRANTED** with respect to Plaintiff's individual capacity claim against Defendant Ake for "fail[ing] to consistently provide the local newspaper or to implement a procedure to ensure that the newspaper be provided on a consistent basis and organized fashion despite numerous requests and grievances;"

(3) Defendants' Motion for Summary Judgment be **DENIED** with respect to Plaintiff's individual and official capacity claims against Defendant Ake for denying Plaintiff's requests for books and literature, religious materials, and the daily newspaper; and

(4) Defendants' Motion for Summary Judgment be **DENIED** with respect to Plaintiff's individual and official capacity claims against Defendant Cantrell and Defendant Denzer for enforcing a policy which prevents WCDC inmates from ordering books and literature, religious materials, and the daily newspaper.

The Court further recommends that Plaintiff's official capacity claims against Defendants East and Arnold should be **DISMISSED;** and that the **CLERK BE DIRECTED** to terminate Defendants Kevin East and Amanda Arnold from this action.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by**

**the district court.**

RECOMMENDED this 12th day of December 2023.

_/s/ Christy Comstock_

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

**STATUS OF REFERRAL: NO LONGER REFERRED**